NOTICE

Decision filed 10/14/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240584-U

NO. 5-24-0584

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MANUCKS, LLC, an Alaska Limited Liability, Company; DAN MANOLAKES; JAMES R. INGHRAM, as Chapter 7 Bankruptcy Trustee of the Bankruptcy Estate of Dan Manolakes; and WAYNE BRUCKS, | ) ) ) ) ) ) | Appeal from the Circuit Court of Champaign County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 16-L-56 |
| ANNE LARSON REAL ESTATE, LLC – SERIES 1201 SOUTH NEIL, a Series of an Illinois Limited Liability Company; LARSON HOLDINGS B, LLC, a Series of an Illinois Limited Liability Company; and DOUG LARSON, | ) ) ) ) ) ) ) ) | Honorable Jason M. Bohm, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1   *Held:*   We reverse the circuit court's order granting summary judgment where genuine issues of material fact exist in the evidentiary record.

¶ 2   Plaintiffs, Manucks, LLC, Dan Manolakes, and Wayne Brucks, appeal from the March 14, 2024, order of the Champaign County circuit court denying their motion to reconsider the court's order granting summary judgment in favor of defendants, Anne Larson Real Estate LLC, Larson Holdings B, LLC, and Doug Larson. Plaintiffs argue that the court erred by granting summary

1

judgment where genuine issues of material fact existed in the evidence and pleadings before the court. For the following reasons, we reverse.

¶ 3                                      I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. In 2012, plaintiffs Dan Manolakes and Wayne Brucks formed Manucks, LLC, for the purpose of opening a restaurant. Defendants owned a commercial building at 1201 S. Neil Street in Champaign, Illinois, with space previously used as an Italian bar and restaurant. Defendants, through their listing agents Matt Wavering and AJ Thoma, published a brochure advertising a "restaurant for lease." The brochure contained "property highlights," two of which listed the property as a "[r]ecently renovated" "[t]urn-key restaurant space." The brochure description also stated, in part: "In 2009, the building was completely remodeled for a local Italian restaurant. The building features two large state-of-the-art kitchens, a large bar area, large formal dining area, an enclosed outdoor patio, and a private banquet room."

¶ 5      Plaintiffs sought an outright purchase of the building, and the parties entered into a purchase and sale agreement on October 23, 2011. The parties, however, never completed the purchase after plaintiffs failed to secure financing. Instead, the parties entered into a lease agreement for the space on April 25, 2013. Plaintiffs renovated the space and opened their restaurant and bar, Orange and Brew Saloon and Grille, on November 23, 2013. Plaintiffs closed the restaurant on December 28, 2014. Plaintiff Manolakes subsequently filed for Chapter 7 bankruptcy and his bankruptcy estate was represented by attorneys and bankruptcy trustees James R. Inghram and Kristin L. Wilson.

¶ 6      On March 9, 2016, plaintiffs filed a complaint against defendants, alleging that plaintiffs, following the execution of the lease agreement, immediately experienced drainage problems with

2

"the bar in the raised area and at the up end segment of the non-functioning buried drains." Repairs forced the health department to close the restaurant and involved "removing the flooring on the raised seating area, jackhammering concrete, and digging up collapsed and broken sewer lines." Plaintiffs alleged that defendants fraudulently misrepresented and concealed the conditions of the leased space. Plaintiffs subsequently filed two more amended complaints.

¶ 7    On August 5, 2019, plaintiffs filed their fourth and final amended complaint again alleging that defendants fraudulently misrepresented and concealed the conditions of the property. The complaint stated that the previous tenants, John and Vicky Buttitta, experienced sewer system issues while operating their restaurant, Buttitta's Famiglia Restaurante. Plaintiffs detailed that the sewer system did not drain properly in the bar area, which reduced the ability to use the sinks in the bar area and caused water to flood onto the floor. Plaintiffs alleged that defendants knew of the conditions, made false representations concerning the property's condition, and therefore induced plaintiffs' reliance to sign the lease.

¶ 8    On August 27, 2019, defendants filed a "Motion to Dismiss Fourth Amended Complaint," which the circuit court denied on July 25, 2019, stating:

> "I'll allow the motion to dismiss the third amended complaint. However, I will, at the same time, I'm going to allow the fourth amended complaint to be filed, and I do think, my reading of the fourth amended complaint, while I understand in Illinois requires specificity with fraud, my reading of the fourth amended complaint is that it is sufficiently specific to state a cause of action."

¶ 9    On July 20, 2021, the deposition of plaintiff Dan Manolakes took place. He testified that he operated as part-owner and realtor for Manucks, LLC. During the deposition, the following exchange took place regarding the listing brochure:

> "Q. [(Plaintiffs' Attorney)] So did you see this advertisement for the real estate before you entered into negotiations?
> A. Yes.
> Q. Okay. And in the first paragraph there where—well, let me back up. There

3

is a section there that says Property Highlights. And I think the 4th bullet point down says Turn[-]key Restaurant Space.

So, when you see an advertisement that says turn[-]key restaurant space, what does that mean to you?

A. Basically short period of time. You move in, operate the restaurant. Everything is functioning.

Q. With that sort of representation in the advertisement, would you expect there to be sewage backup problems?

A. I would not expect that at all.

Q. Would you expect that there would be nonfunctioning air conditioning units?

A. I would hope that if somebody advertised that that all of the AC units are working at that time.

Q. Was it your understanding this advertisement was listed by an agent for Defendants?

A. Yes.

Q. Do you consider this to be a representation made by Defendants regarding the condition of the property?

A. Yes."

Plaintiff Manolakes testified that he did not recall conversing with defendants prior to signing the lease and that he interacted only with defendants' realtor Matt Wavering. In addition, plaintiff Manolakes did not recall any representations made by Matt Wavering, himself, or on behalf of defendants:

"Q. [(Defendants' Attorney)] So my question is: What specifically did Matt Wavering affirm or state that he had provided you everything you needed to assist with due diligence? Was there a written agreement of some kind? An oral agreement of some kind? Or do you know?

A. I don't know.

Q. Same question for Doug Larson.

A. I don't know.

Q. What is the source of the information then that led to Paragraph 16 [of the complaint]? Was it your realtor who provided this information?

A. I don't know."

¶ 10    Counsel for defendants asked plaintiff Manolakes specifics about paragraph 26 of the complaint, which alleged defendants' "actual and apparent agents and/or employees" were aware of the sewer issues at the property. Plaintiff Manolakes testified that this referred to Doug Larson and that the prior tenant, John Buttitta, had informed him of the plumbing issues. Plaintiff

Manolakes said he received this information from Jake Sanders, the Buttittas' restaurant manager. Defendants' counsel next asked about paragraph 27 of the complaint, which alleged defendants received a quote for plumbing work for the issues. He stated this information came from Dan Proctor, a restaurant equipment salesman. Regarding paragraph 28, which alleged defendants represented that there were no issues with the property, plaintiff Manolakes believed this referred to Doug Larson, but did not recall or remember the specific representation.

¶ 11      Next, plaintiff Manolakes testified regarding discussions he had with the prior tenant, John Buttitta, about the property:

> "Q. [(Plaintiffs' Attorney)] So did you ever then talk to John [Buttitta] about the problems with the sewer by the bar?
> A. Not while we were open.
> Q. So—
> A. I talked to John's, Jake Sanders, but I never talked to John [Buttitta] while we were open. He didn't live here anymore. He lived in Florida.
> Q. So when did you talk to John then?
> A. After we closed, I called John to ask him questions about the bar.
> Q. Okay. Do you know about when that was that—
> A. It was right after we closed I called him. I called his cousin. She gave me his number and I called him.
> Q. What month would that have been?
> A. It would have been probably February or end of January.
> Q. Okay. Of 2015?
> A. Right.
> * * *
> Q. You called John and—
> A. He was in Florida.
> Q. And what did you talk to him about?
> A. I asked him if he was aware that, did he know that the bar drain wasn't working and he said he was fully aware. It never worked for him either. Didn't work for us. I said, you know, did you ever have any conversation with the landlord. He said yeah. And that was that.
> Q. But what? You said yeah, but?
> A. He said yeah. Nothing ever happened to it. They didn't repair it. They repaired the kitchen, but they didn't repair the bar."

¶ 12      Plaintiff Manolakes went on to testify that they were unable to use the bar for anything other than making drinks. None of the machines or sinks requiring running water could be operated

5

otherwise "your whole floor was going to be totally wet." The problems began the week after the business opened. He stated that "every time we used the sink or poured something down the drains" water would come up and tiles would break from the wet ground and subfloor. Cockroaches would emerge from the drains and exterminators would come "every day." He reiterated that he believed defendants made false representations regarding the condition of the property and had he known they were false, he would not have entered the lease.

¶ 13 On July 20, 2021, the deposition of plaintiff Wayne Brucks took place. Plaintiff Brucks testified that he formed Manucks, LLC, with Dan Manolakes with the purpose of starting a restaurant. He overheard plaintiff Manolakes and the realtor discussing that the building "was all in good condition to operate a restaurant/bar." He further stated that "there was nothing brought up that there was problems with the building." Plaintiff Brucks then recounted his interactions with defendant Doug Larson:

> "A. Every time I was there, he was there.
> Q. [(Defendants' Attorney)] And do you recall anything that Doug said during these times you were there?
> A. It was all cordial and pretty much cordial. No. We weren't yelling at each other or anything.
> Q. Okay. All right. Do you recall anything specifically he said about the building being operated as a restaurant.
> A. Yes. That was all—yes.
> Q. What do you recall about that?
> A. That we were told the building was in perfect operation to run a restaurant and bar, that there were no issues with—any major issue. As you know, a building that is a hundred plus years, that is a main concern, but we were told that.
> Q. And I guess I am trying to separate out when you say we were told, is that information that Doug told you personally?
> A. I was in the room and Dan would be there, yeah.
> Q. And so you recall Doug being in the room when you were saying there is no problems with this building or something to that effect?
> A. Yes.
> Q. Okay. Was that before you signed the lease agreement?
> A. I believe so.
> Q. And then it says that had you been aware of any sewer issues, you would not have signed the lease. Is that accurate?

6

A. Yes.

Q. And you would not have signed a personal guaranty?

A. Yes.

Q. And then it says because of all of this, the LLC incurred debts in the amount of $314,714.45. Okay?

A. Um-hum. Yes."

¶ 14     On September 19, 2022, the deposition of defendant Doug Larson took place. He testified that he "was the manager of the LLCs that owned the property at 1201 South Neil." When presented with invoices from Schoonover Sewer Services, Inc., dating from 2010—prior to plaintiffs' lease and tenancy—up through 2014 when plaintiffs ultimately closed the restaurant, he testified that he was not aware of any broken sewer lines or significant plumbing issues:

"Q. [(Plaintiffs' Attorney)] Okay. Go to the next page, and this one—I should say the first one we were in May of 2010, and this next page it's September of 2010, and within the descriptions there it says the last—well, about halfway down it says mud found in sanitary line. Sewer is broken about ten to 20 feet from cleanout.

So do you know if any work was done at that time?

A. I don't.

Q. Do you know if you were ever aware that the sewer line was broken in 2010?

A. I don't think I was.

* * *

Q. So do you believe that the tenants at that time took care of whatever this issue was?

A. I doubt it.

Q. Do you think that that condition just remained?

A. I think it—I think it probably did."

¶ 15     On October 31, 2023, the circuit court *sua sponte* vacated the jury trial setting, requested plaintiffs file a bill of particulars, and invited defendants to file a motion for summary judgment. On November 14, 2023, plaintiffs filed their bill of particulars. Defendants filed their motion for summary judgment on November 28, 2023.

¶ 16     On December 22, 2023, the circuit court held a hearing on defendants' motion for summary judgment. In granting defendants' motion for summary judgment, the court reasoned that there

were "factual deficiencies with multiple elements of the [p]laintiffs' claim." The court found that plaintiffs did not sufficiently allege the falsity of "turn-key restaurant" because "the prior tenancy was an operating Italian restaurant. The [p]laintiffs opened an operating restaurant, not an Italian one. I don't think that turns the phrase turn[-]key into a false statement." The court further reasoned that certain provisions in the unexecuted purchase agreement and signed lease did not "say[ ] anything about the landlord representing the property *** free from defects," and that plaintiffs' deposition testimony refuted claims of any verbal representations by defendants or their realtor. Next, the court reasoned that plaintiffs failed to sufficiently allege justifiable reliance because plaintiffs "did not exercise ordinary prudence" in the form of inspections or speaking to the previous tenants. Lastly, the court found that plaintiffs' "damages claims seem to be entirely speculative, conjecture and guess." Plaintiffs filed a motion to vacate or reconsider, which the court denied on March 14, 2024. Plaintiffs timely appealed.

¶ 17                                            II. Analysis

¶ 18       The sole question before this court is whether the circuit court erred by granting summary judgment in favor of defendants. Plaintiffs argue that summary judgment was not appropriate because the evidence before the circuit court "was sufficient to state a cause of action and, to the extent that there was no contrary evidence, unequivocally showed that there were remaining issues of material fact for the jury to decide." Defendants contend summary judgment was appropriate because "[p]laintiffs cannot establish any of the elements of fraud" due to a lack of supporting evidence for the elements.

¶ 19       We review the grant of summary judgment *de novo*. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists" (*id.* at 42-43), and is appropriate

8

only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). Summary judgment is a drastic means of disposing of litigation and is only allowed where the right of the party moving for summary judgment is clear and free from doubt. *Adams*, 211 Ill. 2d at 43. When determining whether a genuine issue of material fact exists, a court must construe pleadings, depositions, admissions, affidavits, and evidence before it strictly against the moving party and liberally in favor of the opposing party. *Id.* "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* A defendant moving for summary judgment may meet the initial burden of production either by affirmatively showing that some element of the case must be resolved in the defendant's favor or by demonstrating the absence of evidence supporting the plaintiff's position on one or more elements of the cause of action. *Hutchcraft v. Independent Mechanical Industries, Inc.*, 312 Ill. App. 3d 351, 355 (2000). Once the defendants have satisfied their initial burden of production, the burden then shifts to the plaintiffs to present some factual basis that would arguably entitle them to a judgment under the applicable law. *Id.*

¶ 20    Here, plaintiffs allege defendants engaged in fraudulent misrepresentation. The elements of fraudulent misrepresentation, or common law fraud, are (1) false statement of material fact; (2) defendants' knowledge that the statement was false; (3) defendants' intent that the statement induce plaintiffs to act; (4) plaintiffs' reliance on the statement; and (5) plaintiffs' damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996). "Fraud-based claims are held to a higher standard of pleading, as there must be specific allegations

9

from which fraud is the necessary or probable inference, including what representations were made, when they were made, who made them, and to whom they were made." *Dvorkin v. Soderquist*, 2022 IL App (1st) 201368, ¶ 86. If plaintiffs fail to establish any element of their fraud cause of action, summary judgment for defendants is proper. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007). Here, the circuit court, in its ruling, appeared to grant summary judgment on the first, fourth, and fifth elements. However, because our review is *de novo*, and the parties address all five elements in their arguments on appeal, we must determine whether plaintiffs raised triable issues of fact on each element.

¶ 21 The first element of common law fraud—false statement of material fact—contains three requirements: (1) defendants must make a misrepresentation, (2) it must involve a fact, and (3) the misrepresentation must be material. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 649 (2001). Plaintiffs argue the representation that the property was "turn-key" constituted a false statement of material fact. Defendants rebut that the advertisement was a mere statement of opinion or "puffing." Defendants also contend that plaintiffs' depositions "unequivocally fail to establish" a false statement of material fact where plaintiff Brucks said he had no personal conversations with defendants, and plaintiff Manolakes could not recall representations made about the condition of the property. We disagree with defendants and find plaintiffs raised a triable issue regarding the false statement of material fact element.

¶ 22 Per plaintiff Manolakes's deposition testimony, "turn-key restaurant" is generally understood as "[y]ou move in, operate the restaurant. Everything is functioning" and would not anticipate sewage backup problems. Plaintiff Brucks testified that they were told the building "was in perfect condition" although he did not recall a personal conversation with defendants. Defendants cite *Younger v. Revelle*, 78 Ill. App. 3d 1, 3 (1979), and *Pacific Cycle, Inc. v.*

10

*PowerGroup International, LLC*, 969 F. Supp. 2d 1098 (W.D. Wis. 2013), in support of their contentions. We agree with plaintiffs that these cases are distinguishable.

¶ 23    In *Younger*, the court found that "turn-key" was a mere prophecy of future development or an opinion as to expectations where the defendant claimed the business would make a profit after a manager's firing and a current manager was being paid $700 per month and supplied with a car, and the plaintiff "would be able to do that and more." 78 Ill. App. 3d at 3. In *Pacific Cycle*, the court found that the defendant's prediction of future success that "all the ingredients to be successful are there" was mere puffery. 969 F. Supp. 2d at 1114. Here, conversely, "turn-key" is more like a statement of present fact, than a subjective opinion. The previous tenant was a restaurant and bar. The listing brochure highlighted a "turn-key restaurant." Plaintiffs sought to open a restaurant and bar in the space. The advertised statement raises a triable issue as to whether the statement constituted opinion or statement of fact. The fact finder could decide whether there was a false statement of material fact where "turn-key restaurant" was not disclaimed as subjective opinion, and it was reasonable for plaintiffs to treat the statement as a factual representation of the space. *Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 905 (1992). Therefore, summary judgment was inappropriate here.

¶ 24    Next, we address the second element of common law fraud—knowledge that the statement was false. Plaintiffs contend defendants knew about the sewer issues and thus knew the statement was false. Plaintiffs specifically argue that because the evidence on this issue is conflicting, the issue should go before a jury rather than disposed of in summary judgment. We agree. Plaintiff Manolakes recounted in his testimony that previous tenant John Buttittas had discussions with defendant Doug Larson which led plaintiff Manolakes to believe defendants had prior knowledge

11

of the plumbing issues. Defendant Doug Larson denied any knowledge of sewer or plumbing issues. Accordingly, this presented a genuine issue of material fact.

¶ 25   Defendants contend that John Buttitta's discussions constitute hearsay and therefore cannot be used in opposition to a motion for summary judgment. See *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 52 ("hearsay *** may not be considered in support of or in opposition to a summary judgment motion"). Plaintiffs rebut that the testimony is offered to show defendant Doug Larson had inquiry notice of potential sewer problems, not for the truth of the statement that there were actual problems. See *Carlson v. Michael Best & Friedrich, LLP*, 2021 IL App (1st) 191961, ¶ 101 (2021) (statements offered to prove inquiry notice of issues with proposed settlement agreement did not constitute hearsay). We agree that the statements do not constitute hearsay. Further, plaintiff Brucks testified that he himself overheard defendant Larson make statements regarding the property's condition. At the very least, the evidence in the record puts defendants' knowledge at issue and a jury should determine whether defendants knew about the sewer issues when they represented the property offered a "turn-key restaurant" space.

¶ 26   Next, we address the third element of common law fraud—intent to induce action. Plaintiffs contend that defendants intended to induce plaintiffs to act. Plaintiffs point to defendant Doug Larson's deposition testimony wherein he agreed that listing a property as "turn-key" would make it more enticing to a potential purchaser or lessee. Defendants argue that the "AS-IS, WHERE IS" portion and the integration "zipper" clause in the lease defeat any claims of intent to induce action. The "zipper clause" stated:

> "ENTIRE AGREEMENT—This Lease contains the entire agreement between the parties hereto and may not be modified in any manner except by an instrument in writing executed by said parties, or their respective successors in interest."

¶ 27    Defendants contend these clauses preclude "[a]ny suggestion that the [d]efendants 'intended' for the [p]laintiffs to rely on any other representation" regarding the property. Plaintiffs argue that the "as-is" clause does not protect defendants where "there are substantial material defects in the premises that cannot be discovered upon a reasonable inspection." See *Bauer v. Giannis*, 359 Ill. App. 3d 897, 908 (2005) (" 'as is' language in a real estate contract does not shield a seller from liability for fraud"). Plaintiffs additionally rebut that the integration clause only concerns future modifications and does not affect the interpretation of the lease. Plaintiffs also argue the lease does not set forth a portion regarding the condition of the property, therefore "there are no provisions which would be contradicted by the introduction of extrinsic evidence to support the claim for fraud." We agree that the "as-is" clause in the lease does not shield defendants from claims of fraud, and that the plain language of the integration clause concerns future modification, not current interpretation. With no limit on plaintiffs' argument about intent to induce, and facts in dispute regarding the issue, the matter presents a triable issue appropriate for a fact-finding jury to decide.

¶ 28    Next, we address the fourth element of common law fraud—justifiable reliance. Plaintiffs contend they relied on defendants' representations when they signed the lease. Plaintiffs testified they would not have signed the lease had they known about the sewer issue or the defendants' false representations. Defendants argue the "as-is" clause and integration clause preclude raising the issue of justifiable reliance. Defendants further argue that plaintiffs "closed their eyes and took no steps to inspect the property," especially considering plaintiff Manolakes's experience as a realtor. As discussed above, we find that neither the "as-is" clause nor the integration clause bar plaintiffs' claims, at least for purposes of summary judgment. Further, we do not agree with defendants or the circuit court that plaintiffs failed to support the element of justifiable reliance. As discussed

13

above, representations made about the condition of the building also put the element of justifiable reliance at issue. A fact-finding jury can determine whether plaintiffs exercised ordinary prudence or did their due diligence, so summary judgment was not appropriate here. *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶¶ 47-48.

¶ 29 Finally, we address the fifth and final element of common law fraud—damages. Plaintiffs allege they suffered damages as a result of the alleged fraudulent representations. Defendants argue that any damages suffered by plaintiffs are speculative and cannot be attributed to defendants. Again, we find this issue better suited for a jury, rather than summary judgment. Plaintiffs allege specific amounts of damages throughout their complaint, with plaintiff Brucks testifying the LLC "incurred debts in the amount of $314,714.45." Whether there was fraud attributable to defendants, which damaged plaintiffs, is a triable issue for a jury to determine. Because we find genuine issues of material fact regarding each element of plaintiffs' common law fraud claim, we find that summary judgment was not appropriate here.

¶ 30                                      III. Conclusion

¶ 31 For the reasons stated, we reverse the circuit court's order granting summary judgment for defendants and remand for further proceedings consistent with this order.

¶ 32 Reversed; cause remanded with directions.